The IZAAK WALTON LEAGUE OF
AMERICA et al., Plaintiffs,

v.

James SCHLESINGER et al., Defendants,

and

Commonwealth Edison Company and
Iowa-Illinois Gas and Electric Company, Defendant-Intervenors.

PEOPLE OF the STATE OF ILLINOIS
ex rel. William J. Scott, Atttorney General of the State of Illinois, Plaintiff,

v.

UNITED STATES ATOMIC ENERGY
COMMISSION et al., Defendants,

and

Commonwealth Edison Company and
Iowa-Illinois Gas and Electric Company, Defendant-Intervenors.

Nos. 2207-71, 2208-71.

United States District Court,
District of Columbia.

Dec. 17, 1971.

———◆———

Joseph Karaganis, Special Asst. Atty. Gen., Harold A. Katz, Irving M. Friedman, William J. Scott, Atty. Gen. State of Ill., David C. Landgraf, Chief, Northern Region Environmental Control Div., Chicago, Ill., Wallace L. Duncan, Jon T. Brown, Washington, D. C., for plaintiffs.

Irwin L. Schroeder, Dept. of Justice, Washington, D. C., Marcus Rowden, Sol., Atomic Energy Comm., Charles Bechhoefer, Atomic Energy Comm., Germantown, Md., for defendants.

Lester S. Hyman, Richard P. Shlakman, Lois J. Schiffer, Washington, D. C., Michael I. Miller, Mark H. Virshbo, Chicago, Ill., for defendant-intervenors.

## MEMORANDUM OPINION

PARKER, District Judge.

Before the Court are two consolidated actions seeking to compel the preparation of environmental impact statements and to perform other duties alleged to be required by the National Environmental Policy Act of 1969 (NEPA)[1] prior to the issuance of an interim operating license for the Quad Cities Nuclear Power Station at Cordova, Illinois.

The plaintiffs in the first proceeding are the Izaak Walton League of America, three of its local chapters, and the United Automobile Aerospace and Agricultural Implement Workers of America (UAW). The defendants are the Atomic Energy Commission (AEC) and certain named members and officials thereof.[2]

In the related suit, the complaint is brought on behalf of the People of the State of Illinois against the AEC, named members and officials, and the United States Army Corps of Engineers.[3] In each proceeding the Commonwealth Edison Company and the Iowa-Illinois Gas and Electric Company were granted leave to intervene as defendants.

At this point in the proceedings the Court's concern is with the issues presented by the first two counts of the pleadings.[4] In the first count it is contended that the AEC regulations in 10 C.F.R. Part 50, Appendix D (effective September 9, 1971)[5] were promulgated without an accompanying environmental statement and without public hearings as required by NEPA,[6] Executive Order No. 11514[7] and the Council on Environmental Quality (CEQ) guidelines.[8] Plaintiffs seek a declaration that these regulations are invalid and an order directing AEC to promulgate new regulations. In the second count it is contended that the AEC's regulations, Appendix D., Section D.3[9] permits the issu-

---

1. 83 Stat. 852, 42 U.S.C. § 4321 et seq.

2. C.A. 2207–71, filed November 4, 1971.

3. C.A. 2208–71, filed November 4, 1971.

4. Counts three and four are not before the Court at this time. Count three requests the preparation of an environmental statement by the Army Corps of Engineers. Count four seeks to discover, under the Freedom of Information Act (5 U.S.C. § 552), an environmental report allegedly made by the Army Corps of Engineers.

5. 36 Fed.Reg. 18071 (September 9, 1971).

6. 42 U.S.C. § 4332(2) (C) (1970).

7. 35 Fed.Reg. 4247 (March 5, 1970).

8. Statements on Proposed Federal Actions Affecting the Environment, Guidelines, 36 Fed.Reg. 7724 (April 23, 1971).

9. 36 Fed.Reg. 18071 at pp. 18075–76. D.3 states:
   This paragraph applies to proceedings on an application for an operating license for which a notice of opportunity for hearing was issued prior to October 31, 1971, and no hearing has been requested. If, in such proceedings, the requirements

ance of an interim operating license without the preparation of a NEPA statement and opportunity for public hearings. Further, it is contended that operation of the Quad Cities Station would be controversial within the meaning of the CEQ guidelines.[10] Plaintiffs request this Court to enjoin the defendants from issuing an interim operating license to Commonwealth Edison and Iowa-Illinois until a NEPA environmental statement is prepared and distributed by the AEC.

The AEC asserts that its regulations are proper; that their issuance complied with the law; that a NEPA statement was not required in their promulgation, nor is such statement required by law when an interim operation license is involved. Together with the intervenors, they also contend this Court lacks jurisdiction over the issues presented and move to dismiss counts one and two of the complaint.

For the reasons set forth, the Court agrees that it does not have jurisdiction over issues involving the issuance or modification of rules and regulations of the AEC and dismisses count one of the complaints. However, the Court concludes that it does have jurisdiction to consider plaintiffs' claim that the AEC violated a clear, non-discretionary, stat-

utory mandate. Accordingly, the Court rules that the motion to dismiss the second count of the complaints should be denied, and further, that plaintiffs are entitled to a preliminary injunction restraining AEC from issuing an interim operating license authorization for the facilities.

The Quad Cities Nuclear Power Station will comprise two boiling water nuclear power reactors, each with an aggregate capacity of 809 electrical megawatts. Application for a construction permit for the first reactor was filed with the AEC by the intervenors on May 31, 1966. An amendment to that application, broadened to include a permit for the second reactor, was filed on August 18, 1966. Following a public hearing, an initial decision of an atomic safety and licensing board authorized grant of the construction permits and they were issued on February 15, 1967.

On September 3, 1968, application was filed for operating licenses for the units and the utilities submitted an environmental report dated November 12, 1970. A "Notice of Consideration of Issuance of Facility Operating Licenses" for both Quad Cities units appeared in the Federal Register on March 16, 1971 (36 Fed.Reg. 5008) and any affected persons could request a hearing within 30 days.

---

of paragraphs 1–9 of section A have not as yet been met, the Commission may issue a license authorizing the loading of fuel in the reactor core and limited operation within the scope of § 50.57(a), upon a showing that such licensing action will not have a significant, adverse impact on the quality of the environment and upon making the appropriate findings on the matters specified in § 50.57(a). In addition, the Commission recognized that there may be other circumstances where, consistent with appropriate regard for environmental values, limited operation may be warranted during the period of the ongoing NEPA environmental review. Such circumstances include testing and verification of plant performance and other limited activities where operation can be justified without prejudice to the ends of environmental protection. Accordingly, the Commission may issue a license for limited operation after consid-

eration and balancing of the factors described in paragraph 2 of this section and upon making the appropriate findings on the matters specified in § 50.57(a): Provided, however, That operation beyond twenty percent (20%) of full power will not be authorized except in emergency situations or other situations where the public interest so requires. Any license so issued will be without prejudice to subsequent licensing action which may be taken by the Commission with regard to the environmental aspects of the facility, and any license issued will be conditioned to that effect. When the requirements of paragraph 1–9 of section A has been met, the provisions of section B.3 applicable to operating licenses will be followed.

10. *Supra*, note 8, paragraph 5(b) at p. 7724.

No request was received, either within the prescribed time period or thereafter. The operating license requests are currently under consideration by AEC.

A series of steps is required to bring a completed nuclear power plant to operational status, commencing with fuel loading, testing and verification of plant performance, and proceeding thereafter to a sequential ascent to power. On October 12, 1971, the applicants filed a request for authorization to conduct all necessary testing for the Quad Cities units and authority to operate them (until March 15, 1972) up to an aggregate level of 809 megawatts. That request is the subject of the second count of the complaints in these cases. The AEC currently has these latter requests under consideration.

On September 9, 1971, the AEC issued substantially revised regulations for implementation of NEPA requirements in AEC licensing proceedings pursuant to the mandate of the Court of Appeals for the District of Columbia Circuit in Calvert Cliffs' Coordinating Committee, et al. v. United States Atomic Energy Commission, et al., 449 F.2d 1109 (D.C. Cir., July 23, 1971). There, because certain portions of the AEC regulations did not sufficiently implement NEPA requirements, the Court ruled that they must be revised so as to give full consideration to environmental issues. Accordingly, the AEC promulgated a revised Appendix on September 9, 1971 [11] requiring stricter consideration of environmental matters by the applying licensee and the Commission. The revisions became effective, without prior notice and hearing, upon publication in the Federal Register. However, interested persons desiring to submit written comments or suggestions on the revisions could do so within 60 days from September 9, 1971, with the view that their observations would be considered in possible further amendments.

The revision was designed to implement and expedite review of the environmental effects of nuclear generating stations in accordance with Calvert Cliffs' and applies to facilities, such as Quad Cities, which were constructed and were almost at the point of applying for an operating license when the Circuit Court ruled. Section D.3 of revised Appendix D is applicable in those circumstances in which notice of opportunity for a hearing on an application for an operating license was issued after March 4, 1971, but prior to October 31, 1971. Consolidated Edison and Iowa-Illinois, pursuant to this section, applied for the issuance of an interim operating license to test the facility and to operate it, up to a capacity of 50% from date of issuance to March 15, 1972.

I

In count one the plaintiffs allege that the AEC should have prepared and distributed an environmental impact statement and conducted public hearings before undertaking a revision of Appendix D regulations implementing NEPA and Calvert Cliffs'. The Court will not pass upon the question whether under the circumstances impact statements and hearings are required with respect to the revised Appendix D since it agrees with the intervenors and the government that a review of regulations promulgated by the AEC lies outside the jurisdiction of this Court.

In 28 U.S.C. § 2342, the Congress, regarding judicial review of Appendix D, expressly stated that the exclusive remedy is in the court of appeals. Section 2342 provides:

> The court of appeals has *exclusive jurisdiction* to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . (4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42. (Emphasis added.)

And 42 U.S.C. § 2239(a) provides:

> In any proceeding under this chapter, for the granting, suspending, revok-

11. *Supra*, note 5.

ing, or amending of any license or construction permit, or application to transfer control, and *in any proceeding for the issuance or modification of rules and regulations* dealing with the activities of licensees . . .. (Emphasis added.)

It is clear that we are dealing with a "proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees" of the AEC. The revised Appendix D rules and regulations in issue specify the procedures involved in the issuance of operating licenses. Since no further presentation before the AEC can affect the operation of such procedures, revised Appendix D is a final order under 42 U.S.C. § 2239(b) which provides:

> Any final order entered in any proceeding of the kind specified in subsection (a) of this section shall be subject to judicial review in the manner prescribed in the Act of December 29, 1950, as amended, and to the provisions of section 10 of the Administrative Procedure Act, as amended.

The above statute is read with 28 U.S.C. § 2344:

> On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies.

Issues, very similar to the present, relating to AEC rules and regulations were the concern of the *Calvert Cliffs'* Court. That case was initially filed and disposed of in the Court of Appeals. This Court has considered and is not persuaded by plaintiffs' memorandum of authority on the issues presented by count one. Any request for review by this Court of the first count of each complaint must necessarily be rejected. A review of revised Appendix D, in accordance with the statute, lies exclusively in the Court of Appeals.

## II

In count two of each complaint the plaintiffs allege that the revised Appendix permits the Commission to issue an interim operating license in the absence of a NEPA statement and public hearings; that operation of Quad Cities would be highly controversial within the meaning of paragraph 5(b) of the CEQ guidelines;[12] and would have a significant impact upon the quality of the environment within the meaning of NEPA.[13]

While an operating license has not issued, the plaintiffs allege there has been a statutory violation because the AEC contends it is not required to issue a NEPA statement. In line with directing the AEC to issue the 102(2)(C) statement, plaintiffs seek a preliminary injunction preventing AEC from issuing the license requested until such statutory compliance is fulfilled.

Intervenors contend, likewise, that this count should be dismissed for lack of jurisdiction. They argue that since the issuance by AEC of a license for interim operating authority is a final order, review is confined exclusively in the Court of Appeals.

Plaintiffs are not requesting review of the granting or denying of a license. They request this Court to direct the AEC to comply with a specific statutory mandate. In this regard the Court does have jurisdiction to consider the issues presented, namely, whether there has been a violation of a clear, nondiscretionary, legal duty.[14] Review in the

---

12. *Supra*, note 8.

13. *Supra*, note 1.

14. *See*, for example, Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) ; Elmo Division of Drive-X Com- pany v. Dixon, 121 U.S.App.D.C. 113, 348 F.2d 342 (1965) ; Deering Milliken, Inc. v. Johnston, 295 F.2d 856 (4th Cir. 1961). *See also*, National Helium v. Morton, 3 ER Cases 1129, 455 F.2d 650 (10th Cir. October 4, 1971) ; Jewel Com-

Court of Appeals is unavailable or inadequate to protect plaintiffs' rights. Does the law, apart from the review provisions investing exclusive jurisdiction in the court of appeals, afford a remedy?[15] This Court observes that plaintiffs lack an adequate remedy since appellate review is only available to parties to the proceeding. Easton Utilities Commission v. A. E. C., 137 U.S.App. D.C. 359, 424 F.2d 847 (1970). The rule makes eminent good sense so as to preclude "the baton of proceeding" from passing on "successively from one legally exhausted contestant to a newly arriving legal stranger." *Id.* at 852. The Government and intervenors make much of plaintiffs' failure to become parties to the proceedings. They contend the inadequacy of the appellate remedy is due solely to plaintiffs' failure to participate before the Commission. This argument is not convincing. Plaintiff's opportunity to intervene occurred during the 30 day period commencing on March 16, 1971.[16] The Court views with concern the fact that the manner in which the thermal effluents would be discharged into the Mississippi River (and the alleged dangers of such discharges) was not disclosed until April 30, 1971.[17] Then, the 30 day period within which the plaintiffs could have become parties, and therefore could invoke the jurisdiction of the Court of Appeals, had expired.[18] Defendants contend the plaintiffs could still intervene after the expiration of the 30 day period.[19] There is no assurance, however, that the plaintiffs will be allowed to intervene. That the plaintiffs

pany, Inc. v. F.T.C., 432 F.2d 1155 (7th Cir. 1970).

In these decisions, review of final orders could only be in the court of appeals as designated by specific statutes. *Leedom* is typical of the cases cited. The National Labor Relations Board refused to take a vote among the professional employees to determine whether a majority of them would vote for inclusion in a collective bargaining unit. The statute, Section 9(b)(1) of the National Labor Relations Act, 49 Stat. 453, 61 Stat. 143, 29 U.S.C. § 159(b)(1) provided that, "the Board shall not (1) decide that any unit is appropriate for such purposes (i. e. collective bargaining) if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit." The Board refused to take such a vote among the professional employees. Suit was brought in the district court complaining the Board had exceeded its statutory power in that professional employees were included in the unit without their consent. The district court found for the plaintiffs in the face of the Board's contention that it lacked jurisdiction. The Court of Appeals for the District of Columbia affirmed the district court's determination that it had jurisdiction. 249 F.2d 490 (1957). The Supreme Court affirmed the decision of the two lower courts.

15. *See* note 14 *supra.*
"Here review by way of § 10 is too remote and conjectural to be viewed as providing an adequate remedy." Leedom v. Kyne, 249 F.2d at 492. ". . . [W]e see no reason to bar District Court jurisdiction here, for relief in that court is appellant's only effective remedy. . ." Elmo Division of Drive-X Company v. Dixon, 348 F.2d at 344. This Court also notes that there is very little said in the legislative history of 28 U.S.C. § 2342 and its predecessors that would lead one to conclude Congress intended to "foreclose District Court jurisdiction in the present case." *Id.* at 344. "If the § 10 (f) proceeding under the National Labor Relations Act is inadequate to protect plaintiff's right, however, the district court had jurisdiction to enforce the right." Deering Milliken v. Johnston, 295 F.2d at 864.

16. This is the publication date of the AEC's notice of intent to issue an operating license. 10 C.F.R., Part 2, § 2.714(a).

17. Admitted by defendant-intervenors in their Points and Authorities supporting their motion to dismiss (November 18, 1971 at p. 2).

18. *See* 10 C.F.R., Part 50, § 50.58(b), 10 C.F.R., Part 2, § 2.714 and 10 C.F.R., Part 50 Appendix D.

19. ". . . [P]etition for leave to intervene which is not timely filed will be dismissed unless the petitioner shows good cause for failure to file it on time." 10 C.F.R., Part 2, § 2.714(a).

"may" be allowed to intervene is speculative at best. The standard the Court would observe if plaintiffs were denied intervention would be whether the AEC abused its discretion in denying the untimely application by plaintiffs. Review of discretionary acts is more limited than agency actions that are compelled by statute. If plaintiffs' request to become parties before the AEC was denied their cry of failure to comply with NEPA would be unadjudicated. Therefore, the Court may never be afforded opportunity to pass on the issue of whether the AEC failed to comply with the statutory mandate of NEPA.[20] *See* Skinner & Eddy Corp. v. United States, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919). Review under 28 U.S.C. § 2342 therefore appears inadequate.

Intervenors also raise the issue of ripeness. They contend that since no license has issued or has been denied, this Court cannot entertain jurisdiction because the action is not yet ripe for judicial review. Citing Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Further, it is alleged the Administrative Procedure Act [21] does not ripen this controversy. This ignores the cases relied upon as precedent for jurisdiction.[22] For example, in Deering Milliken,[23] the agency delay was considered to be illegal and a final agency action within the

meaning of 5 U.S.C. § 704. To say there is an absence of "finality" herein is unconvincing. The agency's own rule precludes issuance of a NEPA statement in the present matter. While the plaintiffs are indeed challenging the granting or denial of a license, more important, they are requesting the agency's compliance with NEPA. They claim that such review must be conducted whether or not a license is granted. For the reasons stated the Court rules that it has jurisdiction to entertain the issues presented by count two.

### III

The standards to be applied in determining whether a preliminary injunction should be granted are found in Virginia Petroleum Jobbers Association v. F. P. C., 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). One of the first to be considered is whether a strong showing has been made by the plaintiffs as to likelihood of success on the merits. In this context the issue is whether they are likely to prevail in their contention that there is a clear, non-discretionary, legal duty imposed by the Act.

This Court must consider the mandate of NEPA utilizing, among others, the legislative history and the teachings of *Calvert Cliffs'*. The pertinent statutes and directive require a "detailed statement" by the responsible official [24] on

20. As discussed above, this Court has no jurisdiction over the promulgation of AEC rules and regulations but we will take notice of the fact that this agency will not make available to the public the impact statement which raises the possibility it did not comply with the requirements of NEPA. Another problem which adds uncertainty to the plaintiff's remedy is where no hearing is required by law and where a genuine issue of material fact is presented. The Court of Appeals is required to transfer the proceedings to a "district court for the district in which the petitioner resides or has its principal office." 28 U.S.C. § 2347. If such transfer were made in this case, it is conceivable that there would be district court proceedings in the Northern and Southern Districts of Iowa (the principal offices of the Izaak Walton League

Iowa Division and Iowa Chapters); the Southern District of Illinois (the principal offices of the Attorney General of Illinois and the Izaak Walton League, Illinois Division); the Northern District of Illinois (the principal office of the UAW Illinois Community Action Program); and the Eastern District of Virginia (the principal office of the national Izaak Walton League of America).

21. 80 Stat. 392, 5 U.S.C. § 702 (1966).

22. *Supra,* note 14.

23. *Supra,* note 14, 295 F.2d at 865.

24. 42 U.S.C. § 4332 (The "Statement" is referred to as the 102(2) (C) statement). The statute requires that "Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to de-

such items as environmental impact, adverse environmental effects, and alternatives to the proposed action. Such statement must be made available to the public and accompany the proposal through the review process. The AEC contends it does not have to comply with all the requirements of NEPA and refuses to issue an impact statement.[25]

*Calvert Cliffs'* did require immediate restructuring of the AEC's rules in order to comply with the mandates of NEPA. The Appendix D., Section D.3 regulation controlling the situation before this Court (i. e. limited operation of an existing power plant) precludes conformity with the public statement section of NEPA [102(2) (C)]. The Quad Cities plant will, if the interim license is granted, operate up to 50% capacity. Regardless of whether a license is issued, NEPA requires consideration of environmental issues throughout the entire decision making process. It is irrelevant to the consideration of the issues before this Court whether a license is granted or denied. For environmental purposes the interim permit could possibly have the same adverse effect as a full operating permit for a limited period of time. It appears that NEPA requires a statement within the ambit of 102(2) (C) in all situations where Federal action will have a significant impact on the environment.[26] What the AEC has done is to conceivably preclude any modification in an existing power plant ready for operation thus the "licensee will have to undergo a major expense in making alterations in a completed facility or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass." *Calvert Cliffs'* (449 F. 2d p. 1128). The guidelines issued by the Council on Environmental Quality require, "To the maximum extent practicable, the section 102(2) (C) procedure should be applied to major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to the enactment of the Act. . . ."[27] The guidelines further state, "It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program."[28] There is no language precluding the issuance of an impact statement to the public.[29] This

velop and enforce environmental standards, *shall be made available* to the President, the Council on Environmental Quality and to the public. . . ." (Emphasis added.)

25. Pertinent legislative history leaves no doubt that the statement is to be made available to the public. *See* House Report 91–768 (p. 8), 115 Cong.Rec. 39701 et seq. (1969) ; 115 Cong.Rec. 29058 (Exhibit 2) (1969) ; *See also* statement by Sen. Jackson (D.Wash.), 115 Cong.Rec. 40420 (1969) and *Calvert Cliffs'*, 449 F. 2d pp. 1114, 1116, 1123, concerning the requirement that the statement be made public.

26. This Court cannot even reach discussion of issues such as the adequacy of the NEPA statement which were before the Court in Environmental Defense Fund v. Corps of Eng. of United States Army, 325 F.Supp. 749 (E.D.Ark., 1971), since the AEC refuses to issue a NEPA statement. District Court Judge Eisele discussed the impact of NEPA upon projects that were started after the Act became effective. The defendants (Corps of Eng. of U.S. Army) could approach the problems of an already started project differently from a new project (a statement this court agrees with). In *Calvert Cliffs'*, the Court intimated that NEPA would not require the same approach with respect to ongoing projects (*See* note 28 and Part V of 449 F.2d pp. 1121–1122, 1127–1129). But this does not mean the AEC can ignore the public impact statement of the Act (§ 102). Judge Eisele stated "at the very least, NEPA is an environmental full disclosure law . . . the 'detailed statement' required by § 102(2) (C) should at a minimum, contain such information as will alert the President, the Council on Environmental Quality, the *public* . . . to all known possible environmental consequences of proposed agency action." *Id.* at 759.

27. 36 Fed.Reg. 7727 (April 23, 1971).

28. *Id.*

29. Environmental Defense Fund v. Corps of Eng. of U.S. Army, *supra*, note 26.

Court is not saying that NEPA or that *Calvert Cliffs'* required "wholesale, and undiscriminating, suspension of licenses previously issued for nuclear power plants."[30] We are not confronted with a challenge to a previously issued license for the only license of that sort would be the construction permit. Construction has been completed. We are now confronted with another kind of impact upon the environment, the threats involved in the operation of a power plant.

While the AEC contends it does consider environmental issues under the D.3 regulation, it claims it has the discretion to comply with less than all the mandates of NEPA.[31] This Court does not think such discretion exists within the framework of that Act. While the AEC is now considering environmental impact, a situation that did not exist in *Calvert Cliffs'*, the AEC uses the same argument that there is a national power crisis and a delay will result in a possible "black-out" in the areas to be served by the power plants. As stated in *Calvert Cliffs'*:

> The procedural duties, the duties to give full *consideration* to environmental protection, are subject to a much more strict standard of compliance . . . . If "irreversible and irretrievable commitment[s] of resources" have already been made, the license hearing (and any public intervention therein) may become a hollow exercise. This hardly amounts to consideration of environmental values "to the fullest extent possible." (449 F.2d at p. 1128).

There are also no duplicative considerations involved since the side jet thermal effluent impact has never been fully considered and to date any available information has not been made public in the form of a 102(2) (C) statement. While the AEC allegedly considers environmental impact, they choose not to make their considerations public in the form of an impact statement as apparently required by NEPA. The exhibits and affidavits submitted by the plaintiffs indicate the actions involving the Quad Cities Station create a situation where there is a "potential that the environment may be significantly affected."[32] Since NEPA [102(2) (C)] requires a statement in situations where Federal actions "significantly affect the quality of the human environment" this Court concludes the plaintiffs have made a strong showing that they are likely to succeed on the merits.

The Court also concludes the apparent failure to comply with the statutory mandate of NEPA constitutes irreparable injury to the class of people represented by the plaintiffs. Since the AEC's action significantly affects the quality of the human environment, the irreparable injury is in the form of denial of rights granted to the plaintiffs under that law.

In balancing the interests, it is noted that delay in operation of Quad Cities involves loss of revenues and possible "black or brown-outs" next summer. The argument that the facilities are needed to abate air pollution from the Iowa-Illinois coal-burning generating units[33] is unconvincing. To substitute the possibility of one form of threat to the environment for another form is unacceptable. It is alleged by the government that a "NEPA impact statement for the Quad Cities units will be completed by December 15, 1971."[34] Since

30. Government's Points and Authorities in Opposition to Motion for Preliminary Injunction (November 18, 1971 at p. 23).

31. *Id.* at pp. 19–20.

32. Section 5(b) of the CEQ Guidelines state a detailed statement under NEPA shall be prepared if such a potential exists. The actions are also considered "highly controversial" within the meaning of the Guidelines. *Supra*, note 8.

33. Points and Authorities of Defendant-Intervenors in Opposition to Plaintiffs' Motion for Preliminary Injunction (November 23, 1971 at p. 2).

34. Points and Authorities of Defendant-Government in Opposition To Plaintiffs' Motion for Preliminary Injunction (November 18, 1971 at p. 9).

the environmental impact study is relatively complete substantial delay will not occur. That some delay will occur is inevitable. *Calvert Cliffs'* stated that the AEC should consider "very seriously" a possible "temporary halt in construction" during the period the agency is reviewing the project. Obviously there may be some delay if such considerations are reviewed when a project is near completion or is ready for operation. When the start up operation is completed the demands brought upon Quad Cities to produce electricity will be even greater once it is known the plant is capable of such performance. The people served by Quad Cities will not be subject to irreparable injury due to a "black or brown-out" but may have to carry on their conscience the further degradation of one of the greatest rivers in the world. The Court's Findings of Fact and Conclusions of Law and Order were issued on December 13, 1971.