**Ralph NADER et al., Plaintiffs,**

v.

**Dixy Lee RAY et al., Defendants,**

**Carolina Power & Light Company et al., Intervenors-Defendants,**

and

**General Electric Company, Intervenor-Defendant.**

**Civ. A. No. 1058–73.**

United States District Court, District of Columbia.

July 13, 1973.

Myron M. Cherry, Chicago, Ill., for plaintiffs.

Arnold T. Aikens, Asst. U. S. Atty., Jerome Nelson, Sol., Guy H. Cunningham, III, Atty. Atomic Energy Commission, for defendants.

John Jay Adams, George F. Trowbridge, Washington, D. C., for intervenors Carolina Power & Light Co. and others.

Wm. R. Perlich, Washington, D. C., for intervenor General Elec. Co.

John B. Denniston, Washington, D. C., for Nat. Elec. Reliability Council, amicus curiae.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

*Findings of Fact*

A. *Background and Plaintiffs' Complaint*

1. On May 31, 1973 plaintiffs filed a verified complaint alleging that the defendant United States Atomic Energy Commission ("AEC" or "Commission") was in violation of § 186(a) of the Atomic Energy Act of 1954 (42 U.S.C. § 2236(a)) and also in violation of its own regulations (10 C.F.R. § 50.100). The complaint asserts that under the facts alleged therein, the AEC is under a non-discretionary legal duty to revoke the operating licenses of 20 named nuclear power reactors. [Complaint ¶¶ 13, 14, 36] On June 15, 1973 plaintiffs filed a motion for a preliminary injunction restraining the AEC from permitting the continued operation of the 20 named plants.

2. The issue raised by plaintiffs concerns the "emergency core cooling system" ("ECCS") of each of the named reactors. The ECCS is an engineered safety system whose function is to prevent the "core" of the reactor [1] from attaining excessively high temperatures and experiencing excessive loss of integrity in the event of a particular kind of

---

1. The "core" refers to that part of the reactor which contains the enriched uranium fuel, in the form of pellets encapsulated in long "fuel rods." It is within the core region that the controlled nuclear fission occurs, the heat from which is used to generate steam, which in turn is used to drive turbines and generators, thence producing electricity.

hypothesized reactor accident, called a "loss-of-coolant accident." [2]

3. Commission regulations require every light-water-cooled nuclear power reactor to contain an ECCS which must "provide abundant emergency cooling." 10 C.F.R. Part 50, Appendix A, Criterion 35. Each of the 20 reactors named in the complaint is a light-water-cooled nuclear power reactor, and each has an ECCS.

4. In order for the ECCS of such a reactor to be found acceptable by the Commission, it must be shown by complex computer calculations that the ECCS complies with certain criteria imposed by the Commission and embodied in Commission regulations. Those criteria, which are generally referred to as the "Interim Acceptance Criteria" ("IAC") were contained in an Interim Policy Statement published by the Commission on June 29, 1971. 36 Fed.Reg. 12,247–48 (June 29, 1971). The calculational methods by which compliance with the IAC must be shown are specifically prescribed in detail by the Commission, in the form of complex mathematical "evaluation models." 36 Fed.Reg. 12,249–50 (June 29, 1971); 36 Fed.Reg. 24,082–83 (Dec. 18, 1971).

5. Plaintiffs' complaint alleges (a) that the AEC's scientific advisors in ECCS matters are in "virtually unanimous" agreement that compliance by a reactor's ECCS with the IAC is not sufficient to ensure the effectiveness of the ECCS; (b) that the Commission nevertheless has licensed and continued to permit the operation of the nuclear plants named in the complaint on the basis of compliance with the IAC; (c) that the continued operation of these nuclear plans represents agency action beyond the Commission's statutory authority; and (d) that consequently the Commission is under a non-discretionary legal duty to revoke the licenses of those plants. [Complaint, ¶¶ 30, 32–36.]

B. *Motions to Intervene*

6. Nineteen electric utility companies filed timely motions to intervene as defendants as of right under Fed.R.Civ.P. 24(a), with supporting affidavits. The 19 utilities own the 20 nuclear power plants named in the complaint, and operate those plants under facility operating licenses granted by the AEC. If plaintiffs prevail, these operating licenses would be suspended or revoked and the 20 plants would be shut down. 42 U.S.C. § 2131.

7. The General Electric Company ("GE") filed a timely motion to intervene as a defendant as of right under Fed.R.Civ.P. 24(a), with supporting affidavits. The affidavits, which are uncontroverted, show that GE is a designer and manufacturer of "boiling water" nuclear power reactors, which have been sold and are being sold to electric utility companies. Some of the 20 reactors named in the complaint were designed and manufactured by GE. If the IAC were to be declared invalid by this Court, or if this Court were to find that compliance with the IAC is not, as a matter of law, a sufficient finding to permit the granting of an operating license, the licensability of GE reactors designed to comply with the IAC could be open to question, and GE's ability to compete with other nuclear reactor manufacturers and with vendors of fossil-fueled generating plants could be impaired. If the Court sets aside the present IAC, GE might be subjected to contractual claims for any necessary modifications to reactors it has sold or contracted to sell and for which AEC operating licenses have not yet been issued. Changes in the IAC might also delay contractual payments to GE by delaying the time in which GE could meet its contractual obligations. In addition, GE is a participant in the AEC's ECCS Rule-making proceeding (discussed below). [Affidavit of Robert Lowenstein, *passim.*]

2. *See* 10 C.F.R. Part 50, Appendix A (Definitions and Explanations); 36 Fed.Reg. 12,248 n. 1, (1971).

### C. Adoption of the Interim Acceptance Criteria

8. In the June 29, 1971 Federal Register notice promulgating the IAC and three approved ECCS evaluation models, the Commission invited comments and suggestions from interested members of the public for a 60-day comment period. The notice stated that

> "[t]he Commission will consider all such comments and suggestions with the view to possible amendments and will issue a report." 36 Fed.Reg. 12,250.

Plaintiffs did not submit any comments or suggestions to the Commission.

9. In the December 18, 1971 Federal Register notice prescribing two additional evaluation models, the Commission invited comments and suggestions from interested members of the public for a 30-day period. 36 Fed.Reg. 24,083. Plaintiffs did not submit any comments or suggestions to the Commission.

10. The record before the Court contains no evidence that plaintiffs moved the Commission for reconsideration of, or otherwise challenged, the adoption of the IAC or the evaluation models.

11. The record before the Court contains no evidence that plaintiffs sought judicial review of the Commission's promulgation of the IAC or the evaluation models under 28 U.S.C. § 2342 or otherwise.

### D. The ECCS Rulemaking

12. On November 30, 1971 the AEC published in the Federal Register notice of a public rulemaking hearing styled "In the Matter of Acceptance Criteria for Emergency Core Cooling Systems for Light-Water-Cooled Nuclear Power Reactors" ("the ECCS Rulemaking"), which is AEC Docket No. RM–50–1. 36 Fed.Reg. 22,774. The notice set forth the procedure by which persons could request to become participants in the rulemaking. The notice also provided that any person wishing to make an oral or written statement in the rulemaking, but not wishing to become a full participant, could request to make a limited appearance. The notice stated that the ECCS Rulemaking was held "for the purpose of aiding the Commission in its determination as to whether or not the subject [Interim Acceptance Criteria] should be retained in [their] present form or adopted in some other form." *Id.*

13. On January 8, 1972 the AEC published in the Federal Register a Supplemental Notice of Hearing for the ECCS Rulemaking in AEC Docket No. RM–50–1, setting forth the detailed procedural rules to be followed in the ECCS Rulemaking, including extensive adversary rights. 37 Fed.Reg. 288–89.

14. The ECCS Rulemaking is presided over by a three-man Hearing Board. The "technological" or "safety" phase of the ECCS Rulemaking hearing commenced on January 27, 1972. The hearings in that phase of the ECCS Rulemaking ran substantially without interruption (except for recesses provided for the purpose of preparing testimony) through December 11, 1972, and the transcripts of that phase comprise 122 volumes totaling over 22,000 pages. Over 260 exhibits totaling thousands of pages were received in evidence during that phase of the ECCS Rulemaking. [Affidavit of Michael L. Burack (Burack Affidavit, ¶¶ 14(a)–(b); Affidavit of Donald P. Irwin (Irwin Affidavit), ¶¶ 13–15].

15. There are eleven full participants in the ECCS Rulemaking. They are (a) the Consolidated National Intervenors (CNI), which is a group of over 50 constituent individuals and environmental organizations from all parts of the nation, (b) the Lloyd Harbor Study Group, an environmental organization from Long Island, (c) GE, (d) three other manufacturers of nuclear power reactors, (e) a consolidated group of electrical utilities,[3] (f) the States of Minnesota, Vermont, and Maine, and (g) the AEC Regulatory Staff. [Burack Affidavit, ¶ 9; Irwin Affidavit, ¶ 7].

---

3. Some of those electrical utility companies are defendant-intervenors in this civil action.

16. Neither plaintiff Nader nor plaintiffs Friends of the Earth is, and neither requested at any time to be admitted as, a participant in the ECCS Rulemaking. [Burack Affidavit, ¶ 10(a); Irwin Affidavit, ¶ 10].

17. Neither plaintiff Nader nor plaintiff Friends of the Earth made, and neither requested an opportunity to make, a limited appearance in the ECCS Rulemaking for the purpose of making an oral or written statement, as provided for in the November 30, 1971 Federal Register notice of proposed rulemaking hearing. [Burack Affidavit, ¶ 10(b); Irwin Affidavit, ¶ 10].

18. On December 30, 1971 CNI filed its request to become a full participant in the ECCS Rulemaking hearing. The CNI request enumerated the more than 50 organizations and individuals who were constituent members of CNI.[4] As late as June 7, 1972 the Hearing Board granted a CNI motion requesting that an additional organization be added as a member of CNI. There is no indication in the record that the ECCS Hearing Board has ever denied a request for additional members to be included in CNI. (Burack Affidavit, ¶¶ 12(a)–(e); Irwin Affidavit, ¶ 9].

19. At no time was either plaintiff Nader or plaintiff Friends of the Earth a member of CNI in the ECCS Rulemaking. At no time did plaintiff Nader or plaintiff Friends of the Earth request that the Hearing Board allow them to be included as members of CNI in the ECCS Rulemaking (Burack Affidavit, ¶¶ 13(a)–(b); Irwin Affidavit, ¶ 10].

20. On December 7, 1972 the AEC published in the Federal Register a "Notice of Availability of the Draft Environmental Statement" in the ECCS Rulemaking. 37 Fed.Reg. 26,052. That Notice provided that interested persons could, within 45 days (i. e., by January 22, 1973), submit comments for the Commission's consideration concerning the Draft Environmental Statement. On December 12, 1972 the Commission issued an Order in the ECCS Rulemaking proceeding stating that all such comments received would be incorporated in the record of the ECCS Rulemaking. [Burack Affidavit, ¶ 19(a); Irwin Affidavit, ¶ 20].

21. Neither plaintiff Nader nor plaintiff Friends of the Earth submitted to the Commission any comments concerning the ECCS Draft Environmental Statement, even though on December 13, 1972 and January 3, 1973 plaintiff Nader publicly expressed both his awareness of the on-going ECCS Rulemaking and his concern for ECCS issues. [Irwin Affidavit, ¶ 11; Burack Affidavit, ¶ 19(b)].

22. As of this date, the environmental phase of the ECCS Rulemaking is still under way. [Irwin Affidavit, ¶¶ 21, 23; Burack Affidavit, ¶ 21].

E. *Factual Support for Plaintiffs' Complaint*

23. As revealed by the complaint, by plaintiffs' supporting affidavits, and by the opposing affidavits, the bulk of the factual support adduced by plaintiffs before this Court in support of their assertion—that the AEC's ECCS advisors are in "virtually unanimous" agreement that compliance with the IAC does not ensure ECCS effectiveness—consists of excerpts from the record of the ECCS Rulemaking. [Irwin Affidavit, ¶ 24; Burack Affidavit, ¶¶ 41–47]. Counsel for plaintiffs conceded this fact during oral argument. (Tr. 18).

24. Plaintiffs' affidavits contain statements attributed to certain ECCS experts which, if credited, would tend to support plaintiffs' assertion. [Affidavit of Henry W. Kendall, Ph.D., In Support of Plaintiffs' Motion for Preliminary Injunction, ¶¶ 37–51; Second Affidavit of Henry W. Kendall, Ph.D., In Sup-

---

4. Three of plaintiffs' named counsel in this action were counsel to CNI or LHSG at various times in the ECCS Rulemaking.

Plaintiffs' affiant, Dr. Henry W. Kendall, was CNI's primary technical advisor in the ECCS Rulemaking.

port of Plaintiffs' Motion for Preliminary Injunction, ¶¶ 3–10]. The opposing affidavits contain statements attributed to ECCS experts which, if credited, tend to disprove plaintiffs' assertion and tend also to establish that some of the experts' statements cited in plaintiffs' affidavits do not adequately represent the views of those experts. These opposing affidavits also conclude that compliance with the Interim Acceptance Criteria presently provides adequate protection for the public health and safety. [Burack Affidavit, ¶¶ 27–29, 41–46; Affidavit of Dr. Stephen H. Hanauer (Hanauer Affidavit), ¶ 14 and Exhibit E thereto; Affidavit of William D. Hinkle (Hinkle Affidavit) ¶¶ 15–20].

### F. Other Commission Proceedings

25. At no time have plaintiffs petitioned the Commission under the Commission's rules of practice (10 C.F.R. §§ 2.800 et seq.; see also 5 U.S.C. § 553(e)) to institute a rulemaking proceeding with the objective of having the Commission adopt a generic rule or regulation to achieve the results plaintiffs seek in this Court, or with the objective of seeking the repeal of the IAC on the ground that compliance with the IAC is not sufficient to ensure ECCS effectiveness. [Irwin Affidavit, ¶ 17].

26. Each of the 20 nuclear plants named in the complaint was granted a construction permit by the Commission after a hearing, pursuant to the AEC's rules of practice (10 C.F.R. Part 2). Each of the plants was subsequently granted an operating license, also following procedures specified by the Commission's rules of practice. Counsel for plaintiffs conceded during oral argument that plaintiffs did not intervene in the proceedings for the granting of

these construction permits or operating licenses, for the purpose of asserting that the permits or licenses could not be granted because of alleged inadequate protection for the public health and safety. (Tr. 25).

27. Plaintiffs concede that they have not asked the Commission to take the action which they request from this Court. [Complaint, ¶ 39]. Plaintiffs allege that any attempt to invoke any of the Commission's procedures would be futile, on the grounds that (a) the Hearing Board in the ECCS proceeding has ruled that matters relating solely to individual plants cannot be raised in that generic proceeding, and (b) that the Commission has indicated that it will not entertain challenges to its generic ECCS regulations (the IAC) in individual plant license cases. [Affidavit of Myron M. Cherry, In Support of Plaintiffs' Motion for Preliminary Injunction, ¶¶ 7–8; Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, pp. 29–31].

### G. Injury to the Plaintiffs, the Public, and to Other Affected Parties

28. If the 20 named nuclear power plants were ordered to cease operating as requested by plaintiffs, significant power shortages could occur in several metropolitan areas of the country, including the Chicago, Minneapolis-St. Paul, Milwaukee, New York, New England, Virginia-Carolinas and Florida areas. Power reserves in various other parts of the country, including the West Coast, would be substantially affected. In some areas the result could be interruption of electrical service on a rotational basis; in several others, the reliability of available power supplies could be significantly affected.[5] [Affidavit of Floyd L. Goss (Goss Affidavit) ¶¶ 10–

5. This finding, as well as the findings in paragraphs 30, 31, and 32 are made on the basis of affidavits before this Court which deal with the consequences for available electrical capacity if the 20 named plants are shut down. These findings are made solely for the purpose of determining the likelihood of injury to the

parties and to the public should the requested preliminary relief be granted. See Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). These findings do not involve facts which are material upon a motion for summary judgment on the merits. See Fed.R.Civ.P. 56(d).

14, 21; Affidavit of William J. Balet, *passim*].

29. Electrical capacity lost from the 20 named nuclear power plants would have to be made up to the extent possible by other types of electrical generation, primarily from oil-fired plants. Significant adverse environmental effects could occur from the necessarily increased use of these plants, and significant increases in reliance on unstable foreign sources of oil could result as well. [Goss Affidavit, ¶ 22].

30. There is, in consequence, a significant possibility of adverse environmental consequences and of increased unit cost of electricity to the consumers of the affected companies.

31. The idling of the large investment held in the 20 named nuclear plants by the companies who own and operate them could work substantial economic harm on these companies.

32. Any injury to plaintiff Nader or to the members of plaintiff Friends of the Earth from the continued operation of the power plants in question would be purely speculative, and would presuppose a series of events which uncontradicted affidavits before the Court show to be extremely improbable. [Affidavit of Edson G. Case, ¶¶ 12–18; Hanauer Affidavit, ¶¶ 9–10; Hinkle Affidavit, ¶¶ 9(b), 10].

### Conclusions of Law

#### A. *Intervention*

■ 1. The nineteen utilities which moved to intervene are the holders of AEC-issued facility operating licenses which would be revoked or suspended if plaintiffs were to prevail. As owners of the nuclear power reactors that would thus be shut down, they clearly have a sufficient interest in property which is the subject of the action and which is not adequately represented by existing parties and are entitled to intervention as of right under Fed.R.Civ.P. 24(a)(2).

2. GE also moved to intervene as of right under Fed.R.Civ.P. 24(a)(2). On the basis of Findings of Fact ¶ 7, the Court concludes that GE has an interest in property which is the subject of the action, that GE's ability to protect its interest may be impaired if this Court were to cast doubt on the validity or adequacy of the IAC, and that GE's interest is not adequately represented by other parties. Accordingly, GE is entitled to intervene as of right. *See* Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694 (1967).

#### B. *Exhaustion of Administrative Remedies*

■ 3. This case involves highly complex matters of nuclear reactor technology which, under the doctrine of primary jurisdiction, should be resolved in the first instance by the AEC. That agency is currently conducting an extensive rulemaking proceeding for the purpose of considering the same technical issues which are now before this Court, and in which numerous interested parties (not including plaintiffs) are participating. Even if the agency were not conducting such a proceeding, this Court would nevertheless have ample justification to conclude that the highly technical matters here in issue should be resolved in the first instance by the agency with expertise in those matters.

4. Plaintiffs have failed to invoke or exhaust any of the administrative or other remedies available to them at the time the IAC were adopted, through which they could have challenged the validity of the IAC. [*See* Findings of Fact, ¶¶ 8–11].

5. Plaintiffs have failed to invoke or exhaust any of the administrative remedies available to them during the still pending ECCS Rulemaking proceedings, through which they could have placed their challenge to the IAC before the Commission. [*See* Findings of Fact, ¶¶ 12–22].

6. Plaintiffs have failed to invoke or exhaust any of the administrative remedies available to them for a new rulemaking proceeding, with the objective of having the Commission adopt a generic

rule or regulation to achieve the results they seek in this Court, or to seek the repeal of the IAC on the ground that compliance with the IAC is not sufficient to ensure ECCS effectiveness. [*See* Finding's of Fact, ¶ 25].

7. Plaintiffs have failed to invoke or exhaust any of the administrative remedies available to them in the individual adjudicatory proceedings which led to the issuance of operating licenses for any of the nuclear power plants named in the complaint. [*See* Findings of Fact, ¶¶ 26, 27].

■■ 8. Plaintiffs have invited the Court's attention to no ruling of the AEC which would have prevented them from questioning the validity of the IAC on an appropriately generic basis in the on-going rulemaking, nor have plaintiffs provided any explanation of their failure to seek a separate rulemaking or a reconsideration of the June, 1971 IAC. No rule of the AEC precludes plaintiffs from raising in individual adjudicatory proceedings the question of reactor compliance with the requirements of either General Design Criterion 35 or the IAC. There is no evidence whatever that had plaintiffs sought to raise before the Commission the issue that they raised in this action the Commission would have denied relief because of a definite policy or statement adverse to plaintiffs' position. *See, e.g.*, School Board of City of Newport News v. Atkins, 246 F.2d 325 (4th Cir. 1957), cert. denied, 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63. Under these circumstances, plaintiffs' failure to exhaust their administrative remedies cannot be excused on the ground of futility. *See* Spanish International Broadcasting Co. v. FCC, 128 U.S.App.D.C. 93, 104, 385 F.2d 615, 626 (1967) (even the probability of an administrative denial of relief is not enough to excuse failure to exhaust on ground of futility); *see also* Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 165–166 & n. 4, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (prior refusal of the Commissioner to consider similar issues held not sufficient to excuse a failure to exhaust administrative remedies).

■ 9. Even if plaintiffs had exhausted the available administrative remedies—or if their failure to do so could be excused on grounds of futility—this Court could not assume jurisdiction. The operation of the exhaustion doctrine does not vest this Court with a jurisdiction Congress has conferred exclusively on the Courts of Appeals. 42 U.S.C. § 2239(b); 28 U.S.C. § 2342.

C. *No Violation of a Clear, Nondiscretionary Legal Duty by the AEC*

10. Under the Atomic Energy Act, the standard applied in issuing facility operating licenses for nuclear power reactors is whether the Commission can find that there will be "adequate protection to the health and safety of the public." 42 U.S.C. § 2232(a). This has been interpreted by the expert agency to mean that it must be able to find "reasonable assurance that the health and safety of the public will not be endangered by operation of the facility. . . ." 10 C.F.R. § 50.35(c); *see also id.* §§ 50.40(a), 50.57(a)(3). The "reasonable assurance" standard was upheld by the Supreme Court in the landmark case of Power Reactor Development Co. v. Int'l Union, Electrical Workers, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed. 2d 924 (1961).

■ 11. Absolute certainty or "complete," "entire," or "perfect" safety is not required by the Atomic Energy Act, nor does nuclear safety technology admit of such a standard. Power Reactor Development Co. v. Int'l Union, Electrical Workers, *supra*; *cf.* Crowther v. Seaborg, 312 F.Supp. 1205, 1234 (D. Colo.1970). The Supreme Court recognized in the *Power Reactor* case that nuclear technology is subject to change. 367 U.S. at 408, 81 S.Ct. 1529, 6 L.Ed.2d 924. What constitutes "reasonable assurance of adequate protection" is also subject to change, as the state of the nuclear safety art advances. *Cf.* Crowther v. Seaborg, *supra*. It is for the Commission to weigh the state of that art,

the risk of accidents, the record of past performance, the need for further improvement in nuclear safety matters, and other considerations. Balancing these factors calls for the exercise of discretion by the expert agency in a judgmental process that is very different from the kind of "clear, nondiscretionary legal duty" to comply with the procedural requirements of the National Environmental Policy Act that the court referred to in Izaak Walton League of America v. Schlesinger, 337 F.Supp. 287, 291 (D.D.C.1971).

12. Based on the record before this Court, the AEC has fully met its statutory responsibility with respect to ECCS safety matters. Its on-going rulemaking proceeding is a sound measure to ensure that the AEC is kept abreast of the evolving state of the art. Furthermore, the Commission's decision to treat the ECCS issue generically in the rulemaking, rather than on a case-by-case basis in the various licensing dockets, is an appropriate exercise of the Commission's broad discretion (see 42 U.S.C. §§ 2013(d), 2201(i)(3), 2201(p)) which this Court has no power (and sees no reason) to upset. See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207.

13. On oral argument, it was suggested by plaintiffs' counsel that the AEC is violating one of its own regulations, General Design Criterion 35, which states in part that "[a] system to provide abundant emergency core cooling shall be provided." 10 C.F.R. Part 50, Appendix A, Criterion 35 (1973). There is no evidence before the Court to support a conclusion that the AEC's actions have violated this Criterion. The IAC represent the AEC's considered expert judgment on what is required to provide reasonable assurance that the ECCS will be adequate to protect the public health and safety, and this Court sees no reason to question the appropriateness of the IAC as an implementation of Criterion 35.

14. Based on the foregoing, this Court concludes that there has been no violation of a "clear, nondiscretionary, legal duty" by the AEC, such as was found in Izaak Walton League of America v. Schlesinger, supra. It follows that this Court lacks subject-matter jurisdiction, in view of the exclusive statutory method of review presented in the Administrative Orders Review Act, 28 U.S.C. § 2342(4). See Gage v. AEC, D.C.Cir., 479 F.2d 1214 (1973); Nader v. Volpe, 151 U.S.App.D.C. 90, 466 F.2d 261 (1972).

**D. Preliminary Injunctive Relief**

15. Plaintiffs have not made the requisite strong showing that they are likely to prevail on the merits of the complaint. As can be seen from the preceding conclusions of law, plaintiffs do not succeed on the merits.

16. Plaintiffs have not presented to this Court any evidence that they will suffer any injury, let alone irreparable injury, from the denial of their request for preliminary injunctive relief, and the record as a whole does not support a conclusion that any irreparable injury will result. Moreover, plaintiffs' apparent lack of urgency in filing a motion for preliminary injunctive relief further suggests the absence of irreparable injury to them from the denial of preliminary injunctive relief. [See Findings of Fact, ¶¶ 21, 32].

17. Granting of the preliminary injunction sought by plaintiffs would cause substantial injury to the consumers of electricity in several parts of the nation and to the intervenors, and would significantly change the status quo among the parties. [See Findings of Fact, ¶¶ 28–31]. The public interest would not be served by issuance of a preliminary injunction. Cf. Hamlin Testing Laboratories, Inc. v. AEC, 337 F.2d 221, 222–223 (6th Cir. 1964).

18. On the basis of the conclusions in the foregoing paragraphs, plaintiffs are not entitled to preliminary injunctive relief. Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958); Quaker Action

Group v. Hickel, 137 U.S.App.D.C. 176, 181, 421 F.2d 1111, 1116 (1969).

### CONCLUSION

The motions to intervene under Fed. R.Civ.P. 24(a) are granted. Defendants and intervenors have filed motions to dismiss. Since matters outside the pleadings were presented to and not excluded by the Court, the motions must be treated as motions for summary judgment under Rule 56. Fed.R.Civ.P. 12(b). So treated, on the basis of the foregoing Findings of Fact and Conclusions of Law, the motions to dismiss must be granted. Similarly, plaintiffs' motion for preliminary injunction must be denied, and the case dismissed. An appropriate order was entered after oral argument on June 28, 1973.